UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC McCOWAN, Petitioner, v. M. YARBOROUGH, Warden, Respondent. | 1:03-CV-05583 LJO DLB HC<br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br>[Doc. #1] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on December 8, 1999, of one count of selling a controlled substance (cocaine base) in violation of Cal. Health & Safety Code § 11352(A). See Lodged Doc. No. 1. In addition, allegations that Petitioner had suffered two prior felony convictions and had served six prior prison terms within the meaning of Cal. Penal Code § 667.5(b) were found to be true. Id. On January 6, 2000, Petitioner was sentenced to serve a total determinate term of fifteen years in state prison. Id.

Petitioner thereafter appealed the conviction. On February 15, 2002, the California Court of

Appeals, Fifth Appellate District, affirmed the conviction. See Lodged Doc. No. 3.

On March 27, 2002, Petitioner filed a petition for review with the California Supreme Court. See Lodged Doc. No. 4. The petition for review was summarily denied on May 1, 2002. See Lodged Doc. No. 5.

On April 28, 2003, Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of California, Sacramento Division. By order of the Court dated May 9, 2003, the case was transferred to the Fresno Division. Following an extensive procedural history in this Court which will not be repeated here, the habeas action now proceeds on the following claim for relief: Petitioner claims the trial court erred in refusing to reopen the competency issue based on new evidence presented. Respondent filed an answer to the petition on July 28, 2005. Petitioner did not file a traverse.

**FACTUAL BACKGROUND**

"On May 14, 1999, [Petitioner] Eric McCowan sold a rock of cocaine to an undercover police officer for $20."[1] See Lodged Doc. No. 3.

With respect to the facts of Petitioner's competency to stand trial, the Court hereby adopts the factual summary set forth by the 5th DCA in its opinion of February 15, 2002[2]:

> Petitioner's preliminary hearing was set for May 28, 1999. However, his attorney, Roger Lampkin, appeared on this date and moved for suspension of the proceedings pursuant to section 1368. The motion was granted and Dr. Carol Hendrix was appointed to assess his competency.
>
> Dr. Hendrix interviewed Petitioner on June 15, 1999, at the Lerdo Sheriff's Facility (Lerdo). She prepared a psychological report dated June 17, 1999. She reported that Petitioner was oriented to place, month and year. He stated he was born on February 4, 1968, the oldest of four children. He admitted to belonging to a gang when he was younger. He also admitted to prior alcohol and drug abuse, but denied current usage. He stated he had been hit in the head and shot.
>
> Although Petitioner states he hears his father, cousins and aunts while he is in his cell, no evidence of psychosis was displayed during the interview. "His affect [was] varied and he was able to respond appropriately" to her questions. Petitioner's ability to think abstractly was fair and he could correctly explain aphorisms such as "Don't cry over spilled milk." According to the Lerdo psychiatric records, Petitioner was seen once on June 1, 1999, and

---

[1]The facts of the underlying conviction are not at issue, thus the short statement of fact.

[2]Pursuant to 28 U.S.C. § 2254(e)(1), the factual summary set forth by the state court is presumed to be correct. For consistency, the words "Appellant" and "Defendant" have been replaced with "Petitioner."

given Risperdal for psychosis.

Dr. Hendrix characterized Petitioner's mood as "evasive. He avoided eye contact, sitting sideways." Yet, when another black inmate walked by the visiting area, Petitioner's countenance changed immediately. He sat up, became alert, grinned and nodded at him, watched him walk away and seemed more anxious to end the interview.

When asked about the pending charges, Petitioner's frequent comment was "They say I had drugs. [I] didn't." He was aware that he could be sentenced to prison. He planned to enter a "not guilty" plea and would consider nothing else. He realized the public defender would be helping him and that the judge "sits on the bench and listens." He "knows he isn't to talk out of turn" and stated that "on one occasion he was taken out of court." He accurately listed common parole conditions.

Dr. Hendrix's diagnostic impressions were as follows: alcohol dependence, in remission; polysubstance dependence; antisocial personality disorder; and learning disorder. Dr. Hendrix concluded Petitioner was competent to stand trial because he "offered adequate answers to questions of competency and is viewed as being able to understand the nature and purpose of the legal proceedings against him, the procedures of the court and roles of the participants. He also indicates a willingness to cooperate with counsel and conduct himself in a behaviorally appropriate manner during the court proceedings."

A competency hearing was held on June 21, 1999, before the Honorable Michael B. Lewis. Petitioner was found competent to stand trial and criminal proceedings were reinstated.

On August 13, 1999, Lampkin made a second section 1368 motion. It was granted and Dr. Middleton was appointed.

Dr. Middleton examined Petitioner on August 24, 1999, and prepared a psychological report dated August 30, 1999. Petitioner was oriented for person, place, day of the week, year and month. He knew the current president of the United States. He was unsure of his age. He now denied any prior drug use. He stated that he had been shot in the head and beaten with a hammer during his childhood and that he had episodes where he lost consciousness as a result of these injuries. Petitioner stated that he had received psychiatric services during his prior incarcerations. He was unsure whether he had ever been placed in a state hospital.

Petitioner was cooperative, but would often pick and scratch at his skin. He sat on the floor and at times paced and swatted at unseen bugs. He stated that he was receiving psychotropic medication at the time of the evaluation and that he had received such medication since he was "little." Petitioner reported visual, auditory and tactile hallucinations. He acknowledged paranoid thinking and thought broadcasting. He complained of suicidal thoughts, crying spells and intrusive thoughts.

Petitioner denied any knowledge when or why he had been arrested. He was also unable to identify the role of a lawyer, judge or jury. He was unable to meaningfully respond to basic legal concepts or address hypothetical situations. However, he knew he had been to prison on a few prior occasions and knew he would go back to prison if his parole was violated.

Dr. Middleton administered an intelligence test. His total intelligence composite score was 40, which fell in the range of moderate mental retardation. He suffered from impaired verbal recall and remote memory. Attention and concentration were functional, but variable. He could not recite the alphabet or count to 20. Dr. Middleton was unable to complete a competency assessment instrument test.

A screening for malingering, the Pankrantz Functional Memory Test, was administered. Petitioner scored in the borderline range. An additional brief screening test was given in which Petitioner responded in a valid manner. However, Petitioner's denial of selling drugs or knowing the other parties with whom he was arrested was characterized by Dr. Middleton as suspicious. Dr. Middleton believed that a complete review of Petitioner's psychiatric history would be helpful in clarifying whether Petitioner was malingering. However, in his opinion, Petitioner's conduct during the interview and his lack of knowledge about the legal proceedings appeared genuine.

Dr. Middleton concluded that Petitioner was not competent to stand trial because he could not "understand the legal concepts presented to him or participate with counsel in his defense. He is unable to meaningfully address the circumstances of his arrest."

Petitioner's second competency hearing was held on October 14, 1999, before the Honorable Arthur Wallace. The matter was submitted to the court on the reports of Drs. Middleton and Hendrix. Petitioner's prior criminal history was also considered. Petitioner was present and personally waived jury trial of his competency. There is no evidence in the record that Petitioner behaved inappropriately during the hearing. Judge Wallace found Petitioner competent. He set forth many reasons in support of this ruling. He was mindful of Petitioner's six prior prison commitments and, although he had been clinically treated in some respects by psychotropic medication in the prison system, "he was not hospitalized as such in any of the - either of the facilities whether it be Vacaville or Atascadero that are part of the Department of Corrections and where seriously mentally ill people that are incarcerated are oftentimes directed so that they can have intensive inpatient care and treatment."

Judge Wallace gave Dr. Hendrix's report more weight than Dr. Middleton's report because it was in Petitioner's perception of his best interest to be found incompetent when he was interviewed by Dr. Middleton. When Petitioner's inability to complete the competency assessment test is combined with his borderline score on the Pankrantz Functional Test for malingering, this suggests that Petitioner was "better prepared" when he talked with Dr. Middleton than with Dr. Hendrix. Often more can be learned by a clinical interview than by psychological testing, unless the testing is done in advance of the interview and the doctor has the test results to guide him or her in structuring the interview. "All things considered, the Court is not satisfied by a preponderance of the evidence that [Petitioner] is, indeed, at this time unable to understand the nature of the proceedings against him, the nature of the acts that bring him before the Court, or is unable to assist counsel to represent him in connection with these proceedings."

Jury trial was scheduled for December 6, 1999. On December 3, 1999, Lampkin moved to withdraw as attorney of record because of a breakdown in communication with Petitioner. Lampkin declared under penalty of perjury that "[Petitioner] refuses to talk to or listen to Defense Counsel or assist in preparation of the case. Petitioner apparently has lost confidence in Defense Counsel because of the holding in the formal hearing concerning a PC 1368 issue, and has stated that he will request a *'Marsden'* motion when the case is sent out for trial." Hearing on Lampkin's withdrawal motion was held that day before the Honorable Richard Oberholzer. Lampkin explained that Petitioner would no longer speak to him because he "feels like [the finding that he was competent] wasn't the appropriate decision, [and] I should have been able to do something about it." The motion to withdraw was denied; Judge Oberholzer stated that he would attempt to arrange a *Marsden* hearing that day.

Later that day, a *Marsden* hearing was held before the Honorable Coleen Ryan. Petitioner, an individual who Dr. Middleton concluded did not know the function of a lawyer, could not recite the alphabet or count to 20, was amazingly articulate. Petitioner expressed his dissatisfaction with Lampkin as follows:

> I have not seen [Lampkin] since June, and I have been incarcerated since May and I only seen him one time, and then I had a competency hearing which I tried to supply Mr. Lampkin with medical files, and I asked him to see me and get some files, and I was found at the hearing competent at the hearing when the doctor found me incompetent, and other tasks that I had given him to help me that I know would help me in my case and he has yet to do them.

Judge Ryan asked Petitioner about these "other tasks." Petitioner replied, "I asked him to get my clothes out and have a photo of me as evidence in my case and he is yet to do it.[3]"

Lampkin stated that the primary problem between the two was Petitioner's dissatisfaction with the results of the competency hearing. In hindsight, he should have had Dr. Middleton testify. Furthermore, he could not obtain Petitioner's prior prison medical records. Therefore, there was little to support Dr. Middleton's opinion. He stated he had since obtained these records and would move for reconsideration of the competency ruling. He had not seen Petitioner "often" because "it is difficult, especially since the competency hearing. [Petitioner] doesn't agree that it was handled right, and he hasn't been willing to communicate with me very much."

Judge Ryan replied that Petitioner "sounds all right to me." She stated that she would not relieve Lampkin because of Petitioner's refusal to cooperate with him and that she was going to give Petitioner the opportunity to talk to Lampkin "right now about your defense." Petitioner replied to Judge Ryan as follows:

> I have been incarcerated since May and I only seen him one time and I don't think you can build a defense on that.

Judge Ryan replied:

> You sound extremely competent to me, and I suggest to you that you stop playing the competency game and get busy and talk to Mr. Lampkin right now. You will be surprised what you will get done.

Trial commenced on December 7, 1999, before Judge Oberholzer. Lampkin made four in limine motions. He first requested that the competency finding be reconsidered because he now possessed prior prison psychiatric records. He told the court that "Dr. Middleton has examined those records and say[s] they greatly bolster his opinion that [Petitioner] is not competent." Judge Oberholzer denied this request because the competency issue had previously been adjudicated. Lampkin had told him "that he doesn't even know why he's here." The following exchange between the court, Petitioner and Lampkin then occurred:

> THE COURT: Okay. Well, he knows why he's here.
>
> THE PETITIONER: Don't know why I'm here.
>
> THE COURT: You don't know why you're here? Where are you?
>
> THE PETITIONER: I don't know.
>
> THE COURT: You don't know where you're at? Where do you think you are?

---

[3]This references Petitioner's position that he did not match the description of the person who sold the narcotics in question.

THE PETITIONER: Supposed to be going home.

THE COURT: Supposed to be going home. Yeah, well, you may be going home. I don't know. It depends on the outcome of the trial.

MR. LAMPKIN: Your Honor, he also tells me that he's got a real bad toothache. He's supposed to see the doctor - the dentist, and he was requesting that the case be trailed.

THE COURT: You wanted to see the dentist tomorrow?

THE PETITIONER: No. I want to get my tooth pulled.

THE COURT: Why don't you go to the dentist.

THE PETITIONER: `Cause you all got me here.

THE COURT: Yeah. I mean why don't you go to the dentist? You can go to the dentist tomorrow, can't you?

THE PETITIONER: I don't know - can't get out of here.

THE COURT: You know where you are. You're in court. You're in jail. That's just what I want to see. You know where you're at.

THE PETITIONER: I don't know where I'm at.

THE COURT: That's what you tell me. If you don't know where you were - if you didn't know, you'd walk out and go to the dentist.

I'm not going to play games, [Petitioner]. We are going to get going on the trial.

In just looking at the file, it looks like a lot of delays along the way. You made a motion, a Marsden motion, earlier this week - or last week, I guess it was, in front of a judge, and that judge didn't find you incompetent at that time. You made that motion.

So apparently at least nothing was brought to her attention. If the judge feels something is brought to their attention, they're obligated under 1368 also to suspend the proceedings. Apparently she saw nothing that would warrant the necessity for suspending the proceedings under 1368.

MR. LAMPKIN: We brought up the issue during that hearing, and Judge Ryan asked if I was going to renew that motion this week in Department One, and we told her that we were. So she didn't consider it any further.

THE COURT: Yeah. She didn't indicate either that she felt that the defendant -

MR. LAMPKIN: No.

THE COURT: -was 1368.

MR. LAMPKIN: That's right.

Lampkin then turned to another matter, one that necessarily assumes Petitioner was, in fact, competent. He informed the court that Petitioner wished to represent himself, although he (Lampkin) would be available in an advisory role. Judge Oberholzer asked

> Petitioner if he wanted to represent himself. Petitioner replied, "I don't know. I just want to go home." The court asked again, "Do you want to represent yourself?" Mr. Lampkin interjected, "Didn't you say in Department One that's what you wanted?" Petitioner answered, "Yeah." Judge Oberholzer asked Petitioner why he wanted to represent himself. Petitioner answered, "I don't know." Judge Oberholzer warned him, "You better keep your attorney, because you won't know how to make an objection. Do you know any of the objections?" Petitioner answered, "No. I don't know nothing." The judge state, "Yeah. So you better have an attorney with you. Okay. All right [?]" Petitioner then answered, "I guess."
>
> Lampkin then made two in limine motions that inadvertently revealed the correctness of the trial court's observation that Petitioner did indeed know where he was and why he was there. They further showed that Petitioner knew the nature of the charges against him and was an active participant in the formulation of his defense. Lampkin first stated, "I just found out from [Petitioner] that the person who was arrested with him at the time of the incident ... has told [Petitioner] that he has some testimony that would be relevant to his case." Lampkin had not spoken with this person, but Petitioner had done so. The court ruled that this person would be brought to court the next day so that Lampkin could speak with him. Lampkin then stated that Petitioner had also told him that the clothes he was wearing when he was arrested at the crime scene "don't fit the description that the officers gave of the person who was involved in the transaction. They're apparently in his property, and he has access to them, and we need to get those to see if they have any relevance." In response, the court ordered that the person and the clothes be brought to court the following day.

See Lodged Doc. No. 3.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was

filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II. Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III. Review of Petitioner's Claim**

Petitioner argues the trial court violated his constitutional rights when it refused to reopen the question of Petitioner's competence to stand trial despite presentation of new evidence. Specifically, Judge Oberholzer denied Petitioner's in limine request for a third competency hearing even though defense counsel had acquired additional evidence and informed the court that Petitioner's mental condition had deteriorated.

The Supreme Court has "recognize[d] that a defendant has a constitutional right 'not to be tried while legally incompetent,' and that a State's 'failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial.'" Medina v. California, 505 U.S. 437, 449 (1992), *quoting* Drope v. Missouri, 420 U.S. 162, 172-173 (1975). Further, a trial judge has a continuing, affirmative responsibility to ensure that a defendant is not tried while incompetent. Medina, 505 U.S. at 449;

Drope, 420 U.S. at 179; Miles v. Stainer, 108 F.3d 1109, 1112 (9th Cir.1997).

Petitioner's claim was first presented on direct appeal to the 5th DCA. On February 15, 2002, the 5th DCA denied the claim in a reasoned opinion. See Lodged Doc. No. 3. On March 27, 2002, Petitioner filed a petition for review with the California Supreme Court. See Lodged Doc. No. 4. The petition was summarily denied on May 1, 2002. See Lodged Doc. No. 5. The California Supreme Court, by its "silent order" denying review of the 5th DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In reviewing Petitioner's claim, the appellate court properly applied governing Supreme Court authority. See Lodged Doc. No. 3 at 11. Citing to Drope v. Missouri, 420 U.S. 162, 171 (1975), the court noted that under both California and federal law, "an accused is competent to stand trial if he or she has the capacity to understand the proceedings and assist counsel in the conduct of a defense in a rational manner." Id. Further, the appellate court properly noted that the defendant bears the burden of proof in establishing his incompetency. Medina, 505 U.S. at 450-51.

The appellate court concluded that there was substantial evidence supporting Judge Oberholzer's decision to refuse to reopen the issue of Petitioner's competency. In light of the facts of the case, this conclusion is certainly not unreasonable. The new evidence that Petitioner refers to were medical records that defense counsel received after the decision on the previous competency ruling was made. However as discussed by the appellate court, defense counsel's offer of proof was insufficient to give Judge Oberholzer reason to doubt the validity of the prior competency finding. The court noted defense counsel failed to describe the records with particularity and simply stated they bolstered Dr. Middleton's opinion.

Moreover, the appellate court found the record clearly showed Petitioner "was attempting to delay the proceedings in every possible manner and thwart the administration of justice." See Lodged Doc. No. 3 at 10-11.

> [Petitioner] began by feigning mental incompetence. When this failed, he refused to cooperate with his attorney. When his attorney was denied permission to withdraw, he attempted to substitute counsel. Thwarted again, on the day of trial he suddenly feigned a loss of all awareness of his surroundings and repeatedly stated he wanted "to go home." Exposed as a liar, he made an equivocal self-representation request. Numerous judges in the superior

> court recognized [Petitioner's] delaying tactics and none were taken in by his ploys. We have a great deal of empathy for those individuals charged with crimes who are truly suffering from serious mental illnesses and are consequently unable to understand the proceedings against them or to assist in their defense. However, we agree with the judges of the superior court that defendant is not so afflicted. Like the judges below, we have no patience for [Petitioner's] manipulative attempts to obstruct the orderly administration of justice.

Id. at 11.

The evidence that Petitioner was feigning incompetence and merely playing games with the court was overwhelming. Between the denial of the second competency motion and the first day of trial, Petitioner's actions were "utterly irreconcilable with a person who has 'no rational understanding of what [was] going on.'" See Lodged Doc. No. 3 at 16. During the *Marsden* hearing held before a different judge which Petitioner had brought and argued just four days before trial, Petitioner showed he was "fully aware of the nature of the proceedings, his legal rights and all other pertinent matters." Id. Petitioner "rationally expressed his dissatisfaction" with defense counsel and "displayed a working knowledge of his legal rights and of the roles and responsibilities of counsel and the trial court." Id. His actions were in stark contrast to someone who allegedly possessed an intelligence quotient of 40 and employed "monosyllabic response[s] and simplistic sentence structure" as Petitioner did four days later on the first day of trial. Id.

Finally, the appellate court noted that the correctness Judge Oberholzer's ruling was confirmed by defense counsel's statements in support of motions in limine. After Judge Oberholzer refused to reopen the competency decision, defense counsel told the court that Petitioner had informed him there was a witness at the jail who had relevant testimony. Defense counsel further stated Petitioner had informed him that the clothes he was wearing when he was arrested did not match the description the officers had given of the person involved in the drug transaction. This active participation in his own defense clearly demonstrates that Petitioner was not incompetent and only playing games. As found by the appellate court, Petitioner clearly demonstrated he was "aware of the nature of the pending charges, understood his lawyer's function," and "was cognizant of his surroundings [and] the nature of the proceedings." Id.

The state court denial of this claim was neither contrary to or an unreasonable application of clearly established Federal law. See 28 U.S.C. § 2254(d). Therefore, the claim should be denied.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:** **June 19, 2007**

/s/ **Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE